IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

YVONNE GEHRKE                                                          PLAINTIFF

VS.                                    CIVIL NO. 04-3042

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                          DEFENDANT

## MEMORANDUM OPINION

Yvonne Gehrke ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the

Social Security Administration denying her application for a period of disability and disability

insurance benefits ("DIB") under Title II of the Act.

### Background:

The application for DIB now before this court was protectively filed on August 22, 2002,

alleging an onset date of May 1, 2000, due to feet, legs, back, and shoulder pain. (Tr. 20, 24). An

administrative hearing was held on October 24, 2003. (Tr. 449-508). Plaintiff was present and

represented by counsel.

On January 27, 2004, the Administrative Law Judge (hereinafter "ALJ"), issued a written

opinion finding that, although severe, plaintiff's osteoarthritis; neuropathy of the foot; and, foot, leg,

and hip pain did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart

P, Regulations No. 4. (Tr. 15). After discrediting plaintiff's subjective allegations, the ALJ concluded

that she maintained the residual functional capacity (hereinafter "RFC"), to perform a light work,

limited by her ability to only occasionally use her feet for foot controls, stoop, crouch, kneel, crawl,

and climb stairs; never climb ropes ladders or scaffolds; frequently finger items; and, need for a

sit/stand option. (Tr. 15-16, 17). As such, he determined that plaintiff could perform return to her PRW as a receptionist, clerical worker, and office assistant. (Tr. 16, 17).

On May 6, 2004, the Appeals Council declined to review this decision. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties were afforded an opportunity to file appeal briefs, but plaintiff chose not to do so. (Doc. # 5).

**Evidence Presented:**

At the time of the administrative hearing, plaintiff was fifty-seven years old and possessed a high school education. (Tr. 12, 455). The record reflects that she has past relevant work experience ("PRW") as a fitness instructor, clerical worker, receptionist, office assistant, and retail worker. (Tr. 12, 457-462).

The pertinent medical records reveal the following. On April 11, 2002, plaintiff was treated for pain in her right knee and shoulder. (Tr. 227). It was noted that she was very active, and that she was teaching multiple water aerobic classes three days per week. On examination, plaintiff's joints were stable and her motion functioning was full. She requested and was given cortisone injections for her pain. (Tr. 225).

On June 15, 2000, plaintiff complained of right wrist pain. (Tr. 224). She was given medication and x-rays were ordered. The x-rays revealed plaintiff's wrist to be stable, showing only postoperative changes consistent with her February 28, 1997, surgery. (Tr. 219).

On December 8, 2000, plaintiff reported falling on a stump. (Tr. 447). At this time, she was treated for knee pain and wound on her right leg. An examination revealed a full range of motion and

2

normal strength in her extremity. As such, she was instructed regarding a home exercise program, whirlpool treatments, and debridement and dressing changes for her wound. Progress notes dated December 29, 2000, indicate that plaintiff's therapy was going well. (Tr. 443). She was discharged from therapy on January 3, 2001, with a notation that all goals had been met and further therapy was not warranted. (Tr. 441).

Records dated June 21, 2001, indicate that plaintiff requested that she be changed from Catapres (Clonidine) patches to oral medication,[1] as the patches were "just too expensive." (Tr. 300). She also complained of intermittent swelling in her feet during the day, indicating that the swelling went down in the evenings. On examination, trace edema was noted in the bilateral pedal areas, but there was no true pitting or pain in the lower extremities. After being diagnosed with hypertension and trace pedal edema, plaintiff was prescribed Clonidine tablets, Hydrochlorothiazide, and Foltx. (Tr. 300).

On July 26, 2001, plaintiff was treated for depression and anxiety. (Tr. 301). She reported an inability to sleep and stated that she experienced crying spells. Plaintiff also indicated that she had a history of hypertension, and that her blood pressure had been running higher than normal. She was noted to be very anxious, and indicated that she felt panicky. As such, the doctor prescribed Effexor and Xanax, and increased her dosage of Lopressor. (Tr. 301).

On July 27, 2001, plaintiff reported right knee and ankle pain. (Tr. 302). She indicated that she had fallen and twisted her knee and ankle. Plaintiff was noted to be ambulating with a mild limp.

---

[1]"Clonidine is used to treat high blood pressure. It works by decreasing your heart rate and relaxing the blood vessels so that blood can flow more easily through the body." *See Clonodine Tablets and Skin Patches, at* www.nlm.nih.gov.

A physical examination revealed mild tenderness to a heavy range of motion with good stability. Therefore, she was diagnosed with bilateral ankle strain, and offered Darvocet for the pain. However, plaintiff refused the pain medication. (Tr. 302).

On August 16, 2001, progress notes reveal that plaintiff reported continued pain in her right ankle. (Tr. 298). She stated that this was from a previous possible bilateral strain. On examination, there was some obvious edema about the right ankle, however, good stability was noted. Thus, plaintiff was prescribed Celebrex, an air splint, and crutches with restrictions against weightbearing activity for one week. The doctor also ordered x-rays of her ankle, and advised her to place ice on the affected area. (Tr. 298).

On November 14, 2001, plaintiff was again treated for right knee pain. (Tr. 294). She indicated that Dr. Knox had recommended that she undergo a total knee replacement, but that she had deferred surgery at this time. Instead, she requested a referral to Dr. Oliver for possible synvisc injections to treat her knee condition, as well as her degenerative arthritis. Plaintiff also complained of worsening anxiety and depression, which she attributed to the fact that her mother now lived next door to her. On examination, her right knee had a full range of motion. However, some crepitus was noted with range of motion. The doctor diagnosed her with right knee pain/degenerative arthritis, hypertension, and depression/anxiety. She was prescribed Zestril and Effexor, and given a referral to Dr. Oliver. (Tr. 294).

On December 13, 2001, plaintiff's blood pressure was reportedly under better control. (Tr. 293). However, she had developed a "dry, hacky cough," which the doctor attributed to the Zestril he had prescribed to treat her hypertension. Therefore, he discontinued that medication and prescribed

Diovan in its place. He advised her to continue the Clonidine, Catopres patch, and Lopressor. (Tr. 293).

On January 3, 2002, plaintiff reported pain in her shoulders, collar bone, and knees. (Tr. 292). Records reveal that she had a personal history of degenerative arthritis and hypertension, as well as a family history of fibromyalgia. In addition, plaintiff had a history of depression, but had discontinued taking her prescribed medication. On examination, the doctor noted that plaintiff was tender on all typical fibromyalgia assessment points. In fact, he stated that "nearly any part of the body which is palpated is tender to the patient and mildly painful." After diagnosing plaintiff with depression, myalgias, and knee pain, he prescribed Effexor. The doctor also increased her dosage of Mobic and refilled her Amitriptyline prescription. He also noted that her hypertension appeared to be well controlled via medication. (Tr. 292).

On March 14, 2002, plaintiff complained of lower back pain, paresthesia, and pain in her lower extremities. (Tr. 291). A fasting blood glucose test was within normal limits. On examination, the doctor noted a full range of motion in her cervical, thoracic, and lumbar spine. There was no evidence of scoliosis, lordosis, or typhosis. As such, plaintiff was diagnosed with lower extremity paresthesias, lower back pain, and possible neuropathy. To investigate further, the doctor ordered an MRI of her lumbar spine. She was also prescribed Ultracet for the pain. The doctor indicated that, should the MRI be negative, he would likely prescribe a trial of Neurontin. (Tr. 291).

On March 20, 2002, the results of plaintiff's MRI revealed slight desiccation and dehydration of the discs in her lower lumbar spine and a bulging of the annulus at the L3-4 level posteriorly. (Tr. 289). Plaintiff reported that her pain was somewhat better after being on Mobic for quite some time,

but indicated that she continued to experience pain. Although she denied any burning sensations or radiation into her legs, she did complain of bilateral pain in the plantar surface of her feet, between the second and third metatarsals. Records indicate that she had a history of Morton's neuroma to the left foot, and reported that it remained painful to pressure. On examination, the doctor noted a full range of motion in her lumbar spine, with no tenderness and good sensation in her lower extremities. There was tenderness between the distal metatarsal of the second and third lower extremity digits, but no palpable masses in that area. As such, plaintiff was diagnosed with bilateral foot pain with possible Morton's neuroma, lower back pain, and hypertension. She was directed to continue taking Diovan for her blood pressure, referred to a podiatrist, and prescribed physical therapy. (Tr. 289).

On June 10, 2002, laboratory tests revealed that plaintiff was suffering from metabolic syndrome with glucose intolerance. (Tr. 288). She voiced complaints of neuropathy, as well as tingling, numbness, and burning sensations in her feet. The doctor noted that plaintiff was quite a bit overweight, with a body mass index of thirty-nine. She was then diagnosed with glucose intolerance, metabolic syndrome, and peripheral neuropathy. Nerve conduction studies and a dietary consultation were ordered. The doctor concluded that she was not in need of medication, at that time. (Tr. 288).

On June 20, 2002, Dr. Bruce Robbins evaluated plaintiff. (Tr. 376). He noted that plaintiff was "unique," in that her motor distal latencies, conduction velocities, amplitudes, and F-waves were all pretty much within normal limits. However, there were significant abnormalities with the sensory distal latencies in the lower extremities. Dr. Robbins indicated that some of this could be due to an age effect, but he was of the opinion that these abnormalities went beyond what one would anticipate with age. (Tr. 376).

On July 23, 2002, plaintiff reported numerous myalgias and arthralgias. (Tr. 287). She stated that she had been experiencing chronic general aches all over her body. Plaintiff also complained of a burning sensation in her feet. Records indicate that she had been diagnosed with neuropathy by Dr. Robbins and placed on Neurontin. Further, it was noted that plaintiff was very sedentary and had a history of being overweight. An examination revealed somewhat increased sensation with monofilament in the lower extremities, mild stasis dermatitis more prominent on the right lower extremity, and trace pedal edema. Plaintiff's left elbow was generally non-tender to palpation with a good range of motion, and a strong grip strength was noted in her hand. Accordingly, she was diagnosed with arthritis, left elbow pain, obesity, neuropathy, and metabolic syndrome with glucose intolerance. The doctor directed her to increase her Neurontin dosage, and prescribed Darvocet, Mobic, exercise, diet, and weight loss. (Tr. 287).

On August 27, 2002, plaintiff was again treated for complaints of neuropathy in her arms and feet. (Tr. 305). Records indicate that she had a history of pulmonary embolus. On examination, she was noted to have a full range of motion in her neck. After diagnosing her with neuropathy, metabolic syndrome, glucose intolerance, hypertension, and depression, Dr. Adkins directed her to continue her present medications, to which he added Glucophage. He also ordered fasting and two-hour postpradial blood sugar monitoring for the next three to six months. The doctor noted that her fasting blood sugar level was not "too bad," at 108. In addition, her A1c was 5.5, which was good. (Tr. 305).

On October 4, 2002, plaintiff complained of severe neuropathy in her feet, with a burning and tingling sensation that she said felt like she was walking on the ends of metal rods. (Tr. 286). Records indicate that she was taking Magnesium, Neurontin, Amitriptyline, and Effexor without benefit.

Further, plaintiff was allegedly experiencing sleep deprivation and depression. Aside from pain, plaintiff's physical examination was normal. As such, she was diagnosed with polyneuropathy. For this, the doctor decreased her dosage of Neurontin and prescribed Depakote. He also gave her a prescription for Hydrocodone to treat her pain. (Tr. 286).

On November 15, 2002, plaintiff complained of tingling and numbness in both feet, associated with burning sensations and aches, constant back pain worsened by activity, a funny and different feeling in her hands, and tension headaches. (Tr. 108). Although she denied any associated weakness with these sensory symptoms, she had noticed some minor difficulty opening tight jars and with fine motor skills. After a physical examination was normal, Dr. Robbie stated that plaintiff was likely to have mild sensory neuropathy. (Tr. 109). He did, however, indicate that her symptoms could also be due to fibromyalgia. In addition, Dr. Robbie diagnosed her with tension headaches and musculoskeletal back pain. For this, he prescribed Zanaflex and Lexapro. He then directed plaintiff to taper off of the Effexor and discontinue the Mobic and Depakote. (Tr. 109).

On December 3, 2002, plaintiff was treated for joint pain. (Tr. 333). She also complained of insomnia. The doctor prescribed Atenolol, and directed her to take her Effexor at night, rather than during the day. He also advised against taking naps during the day, to help with her insomnia at night. (Tr. 333). Further, bone mineral density studies of her left femur and spine were slightly elevated to normal, representing a low risk of fracture. (Tr. 344).

On January 2, 2003, plaintiff returned to Dr. Adkins office with a recurrence of pain in her right knee. (Tr. 332). He noted that she had undergone synvisc injections into that knee the previous January. Since she had received so much benefit from them, plaintiff wanted to do this again. Records

indicate that she was taking Neurontin for the neuropathy in her feet, Magnesium, and Atenolol to control her blood pressure, although her blood pressure continued to run a little high. As such, Dr. Adkins increased her Atenolol dosage, advised her to consult Dr. Robbie concerning the possibility to trying Tegretol and undergoing a nerve biopsy, and scheduled her for repeat synvisc injections.

On January 21, 2003, plaintiff underwent her first synvisc injection. (Tr. 330). Plaintiff was noted to have tolerated the procedure well. Records indicate that she was to follow-up in one week and then the week after that for additional injections. (Tr. 330).

On January 22, 2003, Dr. G. Thomas Frazier evaluated plaintiff regarding pain at the base of her left thumb. (Tr. 383). She reported progressive deformity of the left thumb and increasing pain, worse with pinching and grasping activities. A physical examination of her wrist showed generalized swelling with tenderness to palpation localized to the STT joint. However, there was no tenderness to palpation over the carpometacarpal joint and no swelling present. Further, no tenderness was noted over the flexor carpi radialis tendon. A small volar, cystic structure that most likely represented a cyst emanated from the STT joint. X-rays of her wrist showed STT joint arthritic changes. As such, Dr. Frazier recommended STT joint arthrodesis of the left wrist with distal radius bond grafting using a spider-plate. (Tr. 383).

On February 3, 2003, plaintiff underwent her third synvisc injection into her right knee. (Tr. 329). Records indicate that she was doing fine. No effusion, pain, or bleeding was noted. (Tr. 329).

Plaintiff underwent STT joint arthrodesis of the left wrist with distal radius bond grafting using a spider-plate on March 6, 2003. (Tr. 415). On March 17, 2003, Dr. Frazier indicated that plaintiff was doing well since her surgery, reporting only mild pain that was well controlled via analgesics. (Tr.

382).  The postoperative dressing was removed, revealing a well-healed surgical incision without mild

swelling, fluctuance, erythema, or drainage.  There was moderate digital stiffness secondary to

immobilization.  X-rays of the left wrist showed the STT joint arthrodesis remained in good position.

As such, plaintiff's stitches were removed, she was instructed regarding a scar management and edema

control program, and her hand and wrist were fitted for a forearm-based thumb spica splint to be worn

for the next five weeks.

On April 2, 2003, Dr. Kevin Adkins noted his opinion that plaintiff's neuropathy was not

secondary to diabetes, as plaintiff was not diabetic.  (Tr. 325).  He indicated that she was glucose

intolerant, and that he had prescribed Glucophage in the past to help treat this.  However, Dr. Adkins

reported that the main treatment for this condition was exercise and dietary control.  Therefore, due

to the unknown cause of plaintiff's neuropathy, he recommended a nerve and muscle biopsy.  (Tr.

325).

Dr. Adkins also stated that plaintiff experienced problems with degenerative joint disease in

the knees.  (Tr. 325).  Although she had undergone synvisc injections in the knees to try and improve

her discomfort, he was of the opinion that her condition rendered her unable to maintain gainful

employment.  Dr. Adkins listed plaintiff's problems as obesity, polyneuropathy, and degenerative joint

disease.  (Tr. 325).

On April 21, 2003, plaintiff reported stiffness in her left wrist, but no significant pain.  (Tr.

381).  She indicated that she was continuing to wear her thumb spica splint, removing it only for

hygiene purposes.  On examination, Dr. Frazier noted no tenderness to palpation over the STT joint

or over the thumb carpometacarpal joint.  Further, her active range of motion in the wrist was thirty-

five degrees palmar flexion and fifty degrees dorsiflexion. As such, Dr. Frazier recommended that she continue wearing her splint during the daytime, continue her scar management and edema control program, and begin weighted stretches and dorsiflexion. He also referred her for occupational therapy three times per week for monitoring and assistance with her rehabilitation protocol. (Tr. 381).

On April 29, 2003, plaintiff complained of foot pain. (Tr. 107). She stated that her symptoms consisted mainly of burning and stinging pain in her feet. Plaintiff had recently undergone STT joint effusion on her left metacarpal joint, and reported aches and pains all over. She indicated that the pain was intolerable, as it was allegedly preventing her from working and functioning. Dr. Robbie noted that plaintiff had been tried on many pain medications. At that time, she was reportedly taking Nexium, blood pressure medication, and Darvocet. On examination, Dr. Robbie documented patchy sensory changes in her lower extremities with reflexes two out of four throughout. He also stated that plaintiff had undergone nerve conduction studies and an EMG that were normal, showing no neuropathy. As such, Dr. Robbie voiced his belief that her symptoms could be due to fibromyalgia. For this, he recommended steroid treatment followed by the possible use Duragesic patches. (Tr. 107).

On May 1, 2003, Mark L. Ungerank, a chiropractor, completed an RFC assessment of plaintiff at the request of plaintiff's counsel. (Tr. 361-365). He stated that he had treated plaintiff since March 21, 2003, approximately three times per week. (Tr. 361). Mr. Ungerank diagnosed plaintiff with lumbar, cervical, and thoracic disc degeneration and noted that her progress was "not good." As for symptoms, he stated that plaintiff suffered from neck, shoulder, lower back, pelvic, and bilateral foot pain. Mr. Ungerank concluded that her pain was so severe that it would frequently interfere with her attention and concentration. (Tr. 362). Further, he opined that she could walk "0" city blocks, sit for

fifteen minutes at a time, stand for five minutes at a time, and sit, stand, and walk for a total of less than two hours per day. (Tr. 362-363). Mr. Ungerank also indicated that plaintiff would require periods of walking around during the work day, a sit/stand option, and unscheduled breaks. (Tr. 363). He then stated that she could lift no weight, due to recent wrist surgery, and could rarely twist, stoop, crouch, and climb. (Tr. 364). In addition, he noted that she experienced limitations with regard to repetitive reaching, handling, or fingering. As a result, Mr. Ungerank reported his belief that plaintiff would miss more than four days of work per week, due to her impairments. (Tr. 365).

On May 9, 2003, plaintiff's occupational therapist indicated that she had attended 1/3 of her appointments for the week. (Tr. 411). Records indicate that plaintiff had cancelled appointments due to her work with the Red Cross disaster relief program. Plaintiff reported that she had not been compliant with her home exercise program, but stated that she would try to do her exercises on a more consistent basis. (Tr. 411).

Occupational therapy notes dated May 14, 2003, reveal that plaintiff attended only ½ of the treatment sessions prescribed for that week, secondary to cancelling other appointments due to being "called out" by the Red Cross disaster relief program. (Tr. 410). She stated that she had attempted to be compliant with her home exercise program. The therapist noted that her active range of motion for wrist flexion and extension appeared to be improving steadily, as had her edema. Plaintiff was instructed in the importance of compliance with her home exercise program, with special emphasis placed on it during the times when she was unable to attend therapy sessions. (Tr. 410).

On May 23, 2003, plaintiff cancelled all occupational therapy appointments for that week, secondary to her continued work for the Red Cross disaster relief program. (Tr. 409). Records

indicate that the plan was to continue her occupational therapy once she returned from her trip. (Tr. 409). However, on May 30, 2003, plaintiff indicated that she no longer believed that occupational therapy was needed. (Tr. 408). She stated that she had been doing everything at home and would not be returning for therapy. (Tr. 408).

On June 2, 2003, plaintiff followed-up with Dr. Frazier. (Tr. 380). Her main complaint was some soreness of the volar surface of the right wrist, that she localized to the area of the flexor carpi radialis tendon. She was continuing to wear her wrist splint, removing it only for hygiene purposes and active range of motion exercises. However, in spite of her complaints, plaintiff indicated that her preoperative pain was markedly improved near the base of the thumb. An examination revealed no swelling, fluctuance, erythema, or drainage. There was no instability of the STT joint. Grind tests were negative at the carpometacarpal joint of the thumb, and she had an active range of motion in her wrist of thirty degrees dorsiflexion and forty-five degrees palmar flexion. X-rays of the left wrist showed that the STT joint arthrodesis was well healed and in good position. Therefore, Dr. Frazier recommended continued strengthening exercises and use of her carpal strap on an as needed basis when performing strong grasping or lifting activities. (Tr. 380).

On October 2, 2003, plaintiff was treated by Dr. David Millstein, due to incontinence. (Tr. 386). A cytoscopy revealed true stress incontinence, as well as a second degree urethrocystocele. (Tr. 388). For this, Dr. Millstein referred her to a urologist for repair of the cystocele. (Tr. 388).

On October 15, 2003, plaintiff was admitted to the hospital due to chest pain and shortness of breath. (Tr. 397). She underwent a VQ scan, which was normal, and an adenosine Cardiolite study, which showed possible inferior ischemia. (Tr. 400). Plaintiff was immediately taken for a heart

catheterization, which was essentially normal, indicating a left ventricular ejection fraction of approximately sixty-five to seventy percent. (Tr. 397-398). However, she continued to have chest pain. Doctors concluded that her chest pain was non-cardiac in nature, and released her home on October 20, 2003. Dr. Stephen Wilber noted that plaintiff should undergo an EGD, if she continued to experience pain. (Tr. 397).

### Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274

F.3d 1211, 1217 (8th Cir.2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

## Discussion:

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322

(8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed , "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the entire record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible. The testimony presented at the hearing, as well as the medical evidence contained in the record, are inconsistent with plaintiff's allegations of disability.

First, we note that plaintiff has been fairly active since her alleged onset date. She reported an ability to care for her personal hygiene, do the laundry, wash dishes, change the sheets, iron, vacuum/sweep, take out the trash, perform home repairs, wash the car, shop for groceries and clothing, go to the bank and Post Office, prepare fifteen meals per week, pay bills, use a checkbook, count change, drive familiar and unfamiliar routes, attend church, watch television, listen to the radio, play video games, read, visit friends and relatives, perform stitch work, sew, and go camping. (Tr. 74-75). On paperwork completed for her attorney, plaintiff indicated that she drove, cooked, washed dishes, made the bed, visited relatives, and exercised daily. (Tr. 97-98). On a weekly basis, she reported doing the laundry and talking to her neighbors. Further, plaintiff reported an ability to clean the house, dust, grocery shop, participate in organizations, perform volunteer activities, visit friends, and go out to eat or to the movies on a monthly basis. (Tr. 97-98). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v.*

16

*Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

After reviewing the evidence of record, it is also clear on April 11, 2000, approximately two weeks prior to her alleged onset date, plaintiff was teaching multiple water aerobics classes three times per week. (Tr. 227). Further, in May 2003, she returned to work in some capacity for the Red Cross Disaster Relief Program. (Tr. 409-411). In fact, plaintiff cancelled occupational therapy appointments in order to perform her Red Cross duties. While we do not have enough information concerning the tasks handled by plaintiff or the number of hours worked to make a determination as to whether this qualified as substantial gainful activity, we do believe that it is some evidence of plaintiff's ability to perform work-related activities during the relevant time period. *See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) (holding that although Gregg had not engaged in substantial gainful activity since 1996, his ability to continue to work twenty hours per week as a farmer belied a finding of total disability).

We note that the medical records do indicate that plaintiff was suffering from degenerative changes in her back, as well as possible neuropathy. However, an MRI dated March 20, 2002, revealed only slight desiccation and dehydration of the discs in her lower lumbar spine and a bulging of the annulus at the L3-4 level posteriorly. (Tr. 289). *See Matthews v. Bowen,* 879 F.2d 422, 425 (8th Cir.

1989) (medical reports showing only minimal back problem allowed ALJ to discount claimant's subjective complaints of disabling back pain). In April 2003, it was noted that her nerve conduction study and EMG were negative, indicating no neuropathy. (Tr. 107). *Id.*

We also note that plaintiff's back pain and neuropathy was treated via medication, physical therapy, and home exercises. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints). After a period of treatment via Mobic, plaintiff even reported improvement in her pain. (Tr. 289). *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). Further, a physical examination conducted in March 2002, revealed a full range of motion in plaintiff's cervical, thoracic, and lumbar spine. (Tr. 291). Additionally, records indicate that she last sought treatment for back pain in November 2002. (Tr. 109). *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment).

Medical records also reveal that plaintiff suffered from arthritic changes in the STT joint of her left wrist. In March 2003, plaintiff underwent surgery for this condition, following which she attended few of her prescribed occupational therapy sessions. (Tr. 409-411). By June 2003, an examination of her wrist revealed no swelling, fluctuance, erythema, or drainage, and no instability of the STT joint. (Tr. 380). Grind tests were negative at the carpometacarpal joint of the thumb, and plaintiff had an active range of motion in her wrist of thirty degrees dorsiflexion and forty-five degrees palmar flexion. X-rays of the left wrist showed that the STT joint arthrodesis was well healed and in good position.

(Tr. 380). As plaintiff's condition appears to have improved following surgery, so much so that she refused to complete her occupational therapy and was able to help with the Red Cross Disaster Relief Program, we cannot say that this condition was disabling. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).

With regard to plaintiff's knee problems, records indicate that she suffered from degenerative arthritis of the knee. (Tr. 325). However, progress notes reveal that she received approximately one year of pain relief following her first round of synvisc injections. (Tr. 332). We also note that no significant knee problems were noted after plaintiff underwent her second round of synvisc injections in March 2003. As this condition does appear to be treatable via medication, we cannot say that it is disabling. *See Roth*, 45 F.3d at 282.

While there is evidence to indicate that plaintiff suffered from stress urinary incontinence and a second degree urethrocystocele, the record also reveals that her problem was treatable via surgery. (Tr. 388). *Id*. However, the evidence does not indicate whether or not plaintiff proceeded with the recommendations of Dr. Millstein. (Tr. 388). As such, we cannot say that her alleged physical impairments, whether considered individually or in combination, are so severe as to render her disabled. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

In addition, the record does not contain sufficient objective medical evidence upon which to base a conclusion that plaintiff's mental impairments were severe enough to interfere with her ability to work. Medical records clearly reveal that plaintiff's depression and anxiety were situational, caused

by the fact that her mother lived next door. (Tr. 294). The record also indicates that plaintiff's condition was amenable to treatment via anti-depressants and anti-anxiety medications, namely Effexor and Lexapro. *See Roth*, 45 F.3d at 282. There are no treatment notes to indicate that plaintiff's mental condition ever required her to seek specialized treatment, counseling, or hospitalization. *See Gowel*, 242 F.3d at 796 (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against plaintiff's claim of disability). Further, plaintiff was able to provide assistance to the disaster relief program, in spite of her alleged mental impairment.

Therefore, although it is clear that plaintiff suffers with some degree of pain, she has not established that she is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

With regard to the testimony of plaintiff's husband, the ALJ properly considered this testimony, but found it unpersuasive. As friends and family members typically have an interest, financial or otherwise, in helping the plaintiff obtain benefits, the credibility of their statements is clearly within the ALJ's province. *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform a full range of light work. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

In the present case, the ALJ considered medical assessments prepared by non-examining agency medical consultant, plaintiff's subjective complaints, and her medical records. On December 20, 2002, Dr. Jerry Thomas, a non-examining, consulting physician, completed an RFC assessment of plaintiff. (Tr. 316-323). After reviewing her medical records, he concluded that plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, as well as sit, stand, and walk about six hours in an eight-hour workday. (Tr. 317). No other limitations were noted. (Tr. 317-323).

While we are cognizant of the RFC assessment completed by Mr. Ungerank, plaintiff's chiropractor, we also note that a chiropractor is not an acceptable medical source. *See* 20 C.F.R. §

404.1513 (2000) (indicating that only licensed physician (medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists are acceptable sources). (Tr. 361-365). Further, we find that Dr. Adkins opinion that plaintiff's condition rendered her unable to maintain gainful employment was not entitled to governing weight, as it was contradicted by the medical evidence of record, as well as the evidence concerning plaintiff's participation in the Red Cross Disaster Relief Program. (Tr. 325). *See Anderson v. Barnhart*, 344 F.3d 809, 813 (8th Cir. 2003) (holding that ALJ did not err in failing to credit treating physician's opinion because those opinions were inconsistent and not fully supported by medical evidence).

Also of significance is the fact that none of plaintiff's treating physicians have limited her ability to perform physical activities. *See Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that a lack of medically ordered restrictions weighs against credibility); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (same). Aside from Dr. Adkins aforementioned comments and the RFC completed by plaintiff's chiropractor, none of her treating physicians have commented on plaintiff's ability to perform work-related activities. This, coupled with plaintiff's own reports concerning her ability to participate in a variety of activities, is inconsistent with her allegations of total disability. Therefore, we cannot say that plaintiff's conditions, even when considered in combination, prevent her from performing light work. Plaintiff even indicated that she sat approximately eight hours per day and stood or walked approximately four hours per day. (Tr. 96).

We also find that substantial evidence supports the ALJ's finding that plaintiff could return to her PRW. A vocational expert testified that a person of plaintiff's age, education, and background,

who can perform light work limited by an ability to occasionally feel in both feet, stoop, crouch, kneel, crawl, and use stairs; frequently finger with both hands; and, never use ropes ladders or scaffolds, could perform plaintiff's PRW as a receptionist, clerical worker, and office assistant. (Tr. 501-502). Further, the expert also stated that said person could return to plaintiff's PRW, even if she could only occasionally finger with both hands and required a sit/stand option. (Tr. 503). *Starr v. Sullivan*, 981 F.2d 1006, 1008 (8th Cir. 1992) (holding that vocational expert's response to a hypothetical question provides substantial evidence to support an ALJ's decision, where the hypothetical question sets forth the claimant's impairments with reasonable precision). No evidence has been presented to indicate that the expert's testimony contradicts the information contained in the Dictionary of Occupational Titles. Accordingly, based on the evidence contained in the record, it is clear that plaintiff's combination of impairments does not prevent her from performing all work-related activities.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this the 15th day of September 2005.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE